553 A.2d 500

Moon Township *v.* Findlay Township. West Allegheny School District and Findlay Township, Appellants.

Argued October 4, 1988, before Judges DOYLE, COLINS and PALLADINO, sitting as a panel of three.

*W. Theodore Brooks*, with him, *Matthew J. Carl, Tucker Arensberg, P.C*., for West Allegheny School District and James W. Dunn, Jr., for Findlay Township.

*Robert E. Durrant, Meyer, Darragh, Buckler, Bebenek & Eck*, for Moon Township.

OPINION BY JUDGE PALLADINO, January 27, 1989:

Findlay Township (Findlay)[1] appeals from an order of the Court of Common Pleas of Allegheny County adopting and confirming the report of the Border Commission establishing a boundary between Findlay and Moon Township (Moon) that was in dispute.

Findlay was created out of Moon Township in 1822. A portion of the boundary between the two was indicated, in Findlay's charter, to be a meandering stream,[2] most recently known as McClaren's Run. Between 1936 and 1952, aerial photographs show McClaren's Run to contain a meander loop. Sometime after 1952, the

---

[1] West Allegheny School District intervened in this proceeding and participated at all times. It joins in Findlay's appeal to this court. As the school district to which Findlay belongs, West Allegheny has an interest with respect to the tax revenues generated from the property affected by the boundary dispute.

[2] Streams which travel from hills through valleys tend to meander as a natural method of minimizing and dissipating energy, *i.e.* slowing down. N.T. at 94.

stream's course was modified to accommodate construction of the Parkway West[3] and the loop was removed. Since 1955, the stream's course has been immediately adjacent to the Parkway West. The property between the location of the stream when it contained the loop and the current location of the stream is at the heart of this boundary dispute.

Since 1957, the property has been treated as being in Findlay Township.[4] In 1986 construction of a Marriott Hotel was commenced on the property. Moon acknowledges that the economic impact of the taxes which will result from the Marriott Hotel caused Moon to question the use of the current location of McClaren's Run as the boundary between Findlay and Moon. If the location of McClaren's Run with the loop in it were to constitute the boundary between Findlay and Moon, a large portion of the Marriott property, including most of the hotel itself,[5] would be in Moon.

Moon, on August 8, 1986, petitioned the court of common pleas, pursuant to section 302(c) of The Second Class Township Code (Code),[6] to appoint a commission,

---

[3] The Parkway West is a major highway which runs between the City of Pittsburgh and the Greater Pittsburgh International Airport.

[4] A search of the deeds to the various parcels of land constituting the property shows that since 1957, all were recited to lie in Findlay, Border Commission Finding of Fact 53, and only Findlay real estate transfer tax stamps were affixed to these deeds. Finding of Fact 54. For the purposes of its tax assessment rolls, Allegheny County lists the property as being in Findlay. Finding of Fact 55.

[5] So as to not delay construction of the Marriott Hotel, Findlay and Moon reconciled many differences in their building codes. N.T. at 278-79. The hotel is open and operating.

[6] Act of May 1, 1933, P. L. 103, *as amended*, 53 P. S. §65302(c). Section 302(c) states, in pertinent part:

The courts of quarter sessions [common pleas] may, upon the presentation of a petition, . . . .(c) ascertain and establish disputed lines and boundaries between two or more townships or between townships and cites or boroughs. ...

as authorized by section 303 of the Code,[7] to ascertain and establish the boundary between Moon and Findlay that was disputed. Findlay answered Moon's petition and agreed that a commission should be appointed. In April 1987, the trial court appointed the Border Commission to ascertain and establish the boundary. On September 16, 1987, the Border Commission visited the property on which the Marriott Hotel was being constructed. A two day hearing was then held at which Moon and Findlay presented testimony and evidence concerning the proper location of the boundary. The Border Commission presented its report to the trial court on February 11, 1988. The Border Commission ascertained and established the boundary at the location of McClaren's Run in 1952, prior to the rechanneling of the stream, placing a large portion of the property in Moon.

The trial court, pursuant to section 303 of the Code, confirmed nisi the report. As permitted by section 304 of the Code,[8] Findlay filed exceptions to the report. After

---

[7] 53 P.S. §65303. This section states:

Upon application by petition, the court shall appoint three impartial citizens as commissioners, one of whom shall be a registered surveyor or engineer, to inquire into the prayer of the petition. After having given notice to parties interested as directed by the court, the commissioners shall hold a hearing and view the lines or boundaries; and they, or any two of them, shall make a plot or draft of the lines and boundaries proposed to be altered or ascertained and established if the same cannot be fully designated by natural lines or boundaries. The commissioners, or any two of them, shall make report to the court, together with their opinion of the same. Upon the filing of any such report, the same shall be confirmed nisi, and the court may, by its order, require such notice to be given by the petitioners to the parties interested, as it deems proper.

[8] 53 P.S. §65304. This section states:

Exceptions to any such report may be filed by any person or political subdivision interested within thirty days

a hearing, the trial court, on August 8, 1988, dismissed the exceptions, confirmed absolutely the report, and ordered the boundary to be marked.

Findlay appealed to this court, contending that: (1) the Border Commission inappropriately allocated the burden of proof by requiring Findlay to prove that the loop, known to exist in essentially the same position from 1936 to 1952, was not present at the time of Findlay's creation in 1822 nor created by accretion; and (2) Moon Township, by failing to challenge the use since 1957 of McClaren's Run's current location as the boundary between Findlay and Moon, acquiesced in the current location of McClaren's Run as the boundary and, therefore, is barred from disputing that location as the boundary between the townships. We will first set forth the relevant law for determining the location of the stream boundary in this case and then address each of Findlay's arguments.

## STREAM BOUNDARY

The parties do not dispute the Border Commission's determination of the law to be applied to ascertain the location of the boundary in dispute. Our review of the pertinent law shows that the Border Commission's deter-

---

after the filing of the report, and the court may thereupon fix a day for the hearing of such exceptions, of which such notice shall be given as the court may direct. After hearing, the court shall have power to sustain such exceptions or to dismiss them and confirm the report, or to refer the report back to the same or new commissioners with like authority to make another report, on which like legal proceedings may be had. Where no exceptions are filed within thirty days after the filing of the report, the court shall confirm the same absolutely. When any report is confirmed absolutely, the court shall enter a decree altering or ascertaining and establishing the lines and boundaries as shown in said report.

mination was correct. A brief recitation of that law will be given for a clearer understanding of this case.

Pennsylvania case law holds that when a stream boundary is non-navigable, the actual boundary extends to the middle of the stream, *Smoulter v. Boyd*, 209 Pa. 146, 58 A. 144 (1904), whereas if the water boundary is navigable, the actual boundary is the ordinary low water-mark of the stream. *Freeland v. Pennsylvania Railroad Co.*, 197 Pa. 529, 47 A. 745 (1901). However, when the boundary between two townships is a navigable stream, the legislature has provided that the middle of the stream shall be the boundary. Section 301 of the Code, 53 P.S. §65301. Therefore, it matters not whether McClaren's Run is a navigable or non-navigable stream. Additionally, we note that when a running stream is a boundary, the meanders of that stream are part of the boundary. *Freeland*.

Of particular importance to the instant case are the common law doctrines of avulsion and accretion, which are the law in Pennsylvania. *Freeland*. Succinct definitions of these common law doctrines and their impact on boundaries appear in the United States Supreme Court opinion in *Arkansas v. Tennessee*, 246 U.S. 158, 173 (1918):

> [W]hen the bed and channel [of running streams] are changed by the natural and gradual processes known as erosion and accretion, the boundary follows the varying course of the stream; while if the stream from any cause, natural or artificial, suddenly leaves its old bed and forms a new one, by the process known as avulsion, the resulting change of channel works no change of boundary, which remains in the middle of the old channel, although no water may be flowing in it, and irrespective of subsequent changes in the new channel.

All parties concede that the present course of McClaren's Run, next to the Parkway West, was the result of avulsion. There is also no dispute that any changes between 1936 and 1952, the year in which the course of the stream was suddenly altered to accommodate the construction of the Parkway West, were caused by accretion. The boundary dispute between Findlay and Moon focused on whether the existence of the meander loop was the result of accretion or avulsion. If the loop and its location were the result of accretion, the proper boundary would be the course of McClaren's Run in 1952. The Border Commission concluded that the stream's course, as shown in 1952, "did not change from 1822 except through accretion," Border Commission Conclusion of Law 2, and established the 1952 location of McClaren's Run as the location of the disputed boundary.

## BURDEN OF PROOF

Findlay contends that the Border Commission "erred in imposing the burden on Findlay Township to prove the location of McClaren's Run . . . was due to avulsion . . . which could have occurred from 1822 to 1936," and argues that "the burden of proof was on Moon to establish that the 1936 location was due to accretion since 1822." Findlay's brief at 6. We note that the Border Commission did conclude that the undisputed evidence of McClaren's Run from 1936 to 1952 placed the burden of proof on Findlay to prove a different location of the boundary. Border Commission Conclusion of Law 3. However, we note that the Border Commission also concluded: "In any event, Moon Township's evidence justifies, if not compels, the conclusion that the 1952 location of the stream was the natural result of accretion since 1822 thus satisfying a burden of proof, if such were to lie with Moon Township." Border Commission Conclusion of Law 5. The Border Commission, while concluding that Findlay

did have the burden of proving that the location of the boundary was other than the location of McClaren's Run in 1952, first evaluated the evidence with the burden of proof on Findlay, concluding that Findlay had not met its burden, and then with the burden on Moon, concluding that Moon did prove the location of McClaren's Run in 1952 had not changed since 1822 except through accretion. Therefore, any error in assigning the burden of proof to Findlay was removed.

It is our conclusion, though, that when township boundary disputes are resolved under sections 301-308 of the Code, there is no burden of proof to be allocated. Section 302 of the Code specifically provides that the court is to "ascertain and establish disputed lines and boundaries." Section 303 of the Code permits a commission to be established to find the facts with respect to the dispute and offer its opinion of the location of the disputed boundary to the court. This court has held that the court may not disturb the determination of the commission except with respect to errors of law and held that if there is legally competent evidence to support the determination of the commission, it must be affirmed. *Collier and Robinson Township Boundary Dispute (Collier I),* 9 Pa. Commonwealth Ct. 193, 303 A.2d 575 (1973). We hold that the legislature, in sections 302 and 303 of the Code, has provided that either the court or a commission is to hold hearings to collect relevant evidence, with respect to a disputed boundary, from all interested parties and a boundary, consistent with the law and supported by the evidence, is to be ascertained and established. Neither the court nor the commission is restricted to establishing as the boundary one proposed by an interested party, but rather *must* determine the legally correct boundary. There is no burden of proof to be allocated.

As a reviewing court, we are limited to determining whether an error of law has been made or competent evidence exists to support the commission's conclusion. *Collier I*. We have reviewed all the testimony and exhibits presented in this case and conclude that there exists legally competent evidence to support the Border Commission's conclusion that the only changes in the location of McClaren's Run from 1822 to 1952 were the result of accretion. Having previously determined that the law recognizes changes in property boundaries, marked by running streams, that result from the process of accretion, we conclude that the disputed boundary was properly established at the 1952 location of McClaren's Run.

## ACQUIESCENCE

Findlay contends that because Moon acquiesced in the current location of McClaren's Run as the boundary between the two townships for over 30 years, Border Commission Finding of Fact 52, the current location constitutes the true boundary, even if it is not consistent with the boundary established in 1822. In support of this position, Findlay makes a two prong argument.

First, Findlay references case law dealing with the resolution of private boundary disputes where acquiescence in a boundary for a period of at least 21 years is conclusive evidence of the boundary's location. *See Inn Le'Daerda, Inc. v. Davis*, 241 Pa. Superior Ct. 150, 360 A.2d 209 (1976); *Allison v. Oligher*, 141 Pa. Superior Ct. 201, 14 A.2d 569 (1940). Then, in support of the application of this principle to municipal boundaries, Findlay quotes McQuillin, The Law of Municipal Corporations §7.09 (3d ed. 1988):

> Although contrary authority exists, long acquiescence in the location of municipal boundaries by the [municipality] and the inhabitants

thereof where all municipal action and improvements have been done under the assumption that such are the boundaries will support the conclusion that such are the true boundaries, notwithstanding they were not originally so located. Particularly is this true where there is doubt as to what the true boundaries were in fact, or as to the legality of their establishment, or where personal, civil, and political rights have become affixed according to the boundaries established by usage. Thus, after the lapse of nearly twenty years, every presumption must be in favor of the regularity of proceedings to attach certain territory to a town.

. . .

Findlay points out that it provides police, fire protection and other municipal services to the Marriott Hotel and that all taxes on the property have been paid to Findlay since 1957. Findlay also references the fact that the Marriott Hotel can only be reached by roads through Findlay and that the Marriott Hotel receives water service from the Findlay Township Water Authority.

Findlay's reliance on case law applying the doctrine of acquiescence to private property boundary disputes is misplaced. The doctrine of acquiescence is very similar to the doctrine of adverse possession, which establishes ownership of property in the adverse possessor where the property has been openly and adversely occupied by the adverse possessor for more than 21 years. The Pennsylvania Supreme Court has acknowledged that the doctrine of adverse possession applied to private property is not applicable to disputes between municipalities. *McCandless Township Appeal*, 401 Pa. 428, 165 A.2d 23 (1960). We conclude that case law applying the doctrine of acquiescence to private property boundary disputes is inapplicable to municipal boundary disputes.

Pennsylvania is noted by McQuillin as being a "contrary authority" for the proposition that long acquiescence in the location of a boundary by a municipality, coupled with municipal action and improvements to the property, supports a conclusion that the acquiesced in boundary is the true boundary. The case referenced is *Ekin v. Board of Commissioners*, 93 Pa. Commonwealth Ct. 528, 502 A.2d 303 (1985), *appeal dismissed,* 516 Pa. 19, 531 A.2d 1109 (1987), in which this court held that county boundaries can be altered only by initiative or referendum. This conclusion was based on an opinion of the Pennsylvania Supreme Court in *Derry Township Supervisors v. Borough of Hummelstown,* 458 Pa. 396, 326 A.2d 342 (1974). In *Derry Township,* the Supreme Court held that the failure of the Pennsylvania Legislature to enact legislation establishing a uniform procedure for consolidation, merger or change of municipal boundaries, as provided by Article IX, section 8 of the Pennsylvania Constitution, within the time mandated by Article IX, section 14 of the Pennsylvania Constitution of 1968, limited the methods by which a municipal boundary could be changed to those methods in Article IX, section 8—initiative and referendum. The Supreme Court also held that Article IX, sections 8 and 14 repealed all statutory provisions dealing with municipal boundary alteration. *See also Collier and Robinson Townships Boundary Dispute (Collier II),* 25 Pa. Commonwealth Ct. 230, 360 A.2d 841 (1976) (petition for alteration of boundary between two townships held improper procedure because request made subsequent to time limit for legislature to adopt uniform legislation).

The statutory provisions dealing with boundary disputes among boroughs and townships, however, were not affected by the legislature's failure to act in accordance with Article IX, sections 8 and 14 of the Pennsylvania

Constitution of 1968.[9] *Connoquenessing Township v. Butler Township*, 88 Pa. Commonwealth Ct. 530, 491 A.2d 288 (1985); *Appeals of Jenkins Township and Laflin Borough (Laflin I)*, 44 Pa. Commonwealth Ct. 402, 404 A.2d 717 (1979). This court has considered the acquiescence argument within the context of a true boundary dispute. *Laflin Borough v. Yatesville Borough (Laflin II)*, 54 Pa. Commonwealth Ct. 566, 422 A.2d 1186 (1980). In *Laflin II* this court concluded that the commission was correct in determining that the property affected by a boundary dispute among three municipalities could not legally be within Yatesville Borough but still considered an acquiescence argument by Yatesville Borough which, if accepted, would have altered that legally determined boundary of Yatesville Borough. The boundary Yatesville sought would have satisfied one element of the description in the charter of Laflin Borough. It was rejected because it would have made four other elements of the description in the charter inaccurate.

Based on our review of the preceding case law, we conclude that Pennsylvania does not recognize the doctrine of acquiescence when to do so would alter known municipal boundary lines but will, in true boundary disputes, consider an estoppel argument based on a municipality's long acquiescence to a conceivably true boundary location. The boundary dispute between Findlay and Moon meets this requirement. Findlay seeks the current location of McClaren's Run, the stream established in its charter as a boundary between Findlay and

---

[9] Section 302(c) of the Code (second class townships) mimics the language of section 302(c) of The First Class Township Code, Act of June 24, 1931, P.L. 1206, *as amended,* 53 P.S. §55302(c) and section 502(iii) of The Borough Code, Act of February 1, 1966, P.L. (1965) 1656, *as amended,* 53 P.S. §45502(iii). All provide for petition to the court of common pleas for settlement of boundary disputes. *See supra* note 6.

Moon, to be determined the true boundary. It is conceivable that evidence could have been introduced which would have supported that location as the true boundary.

Findlay acknowledged at oral argument that its acquiescence argument is the same argument as that made by Yatesville Borough in *Laflin II*. Yatesville's argument is described in *Laflin II*, 54 Pa. Commonwealth Ct. 571-72, 422 A.2d at 1189 (emphasis added), as follows:

> A remaining issue [raised] by Yatesville . . . is whether the land should be designated as part of Yatesville . . . in view of the history of the long association of the questioned area's residents with Yatesville. . . . Yatesville contends that Laflin and Jenkins Township should be *estopped* from making a claim to the land because the record contains testimony by residents of the disputed area that they paid their taxes to Yatesville; that Yatesville has provided services consisting of street cleaning, garbage collection, snow removal, and relating to fire hydrants, police protection, and street lights; that deeds and agreements of sale designated the land as located in Yatesville; and that their children attended the school district serving Yatesville.

Yatesville cited as support for this estoppel argument 12 Am. Jur. 2d, *Boundaries*, §89 (1966):

> The erection of improvements by one adjoining owner after entering lands in accordance with an agreement, *or acquiescence for a long period of time,* as to the location of a boundary line, may estop the other from asserting that such boundary line was not the true line. (Emphasis added.)

This court rejected the estoppel argument in *Laflin II* because Yatesville had made no improvements to the

property, noting that Yatesville Borough alleged only that it had supplied municipal services.

Findlay, as previously noted, relies on McQuillin to support its position that Moon's acquiescence for 30 years in the current location of McClaren's Run as the boundary should bar Moon from asserting a different location. McQuillin also recognizes that the acquiescence is basically an estoppel argument. *Id.* §7.09. Findlay refers to the following evidence in support of its argument:

> Findlay Township has relied upon the historically recognized and reported boundary in making improvements which benefit the Marriott site. Police and fire protection for the Marriott site have historically been and continue to be provided by Findlay Township. . . . Manholes and water sewage tanks which service the Marriott site are located in Findlay Township. . . . Findlay Township has revalved the current Marriott site and constructed sewer modules to efficiently and effectively service the parcel. . . . The Marriott has entered into a service agreement and has paid tap-in fees to the Findlay Township Water Authority to provide water service to the site. . . . The Marriott site is accessible only by taking roads through Findlay Township.

Findlay brief at 20-21.

The provision of municipal services is insufficient to sustain an estoppel in a municipal boundary dispute. *Laflin II*. Findlay has alleged improvements to the property but these improvements were made only to benefit the Marriott Hotel. No improvements to the property are alleged to have been made *prior* to the initiation of the Marriott Hotel project. The same project caused Moon to investigate the location of the boundary line and initiate this boundary dispute. Part of the estoppel doctrine,

applicable to boundary disputes, not quoted in the *Laflin II* opinion, states:

> A landowner who knows the true line and silently permits an adjoining owner to make substantial improvements past the line unknowingly is estopped to claim to the true boundary; and the same is true if the landowner by conduct or assertions as to the boundary line is instrumental in having improvements made past the true line. However, the mere making of declarations and admissions, not amounting to representations inducing the other party to act to his damage, as to the location of the boundary lines, when made in good faith and by mistake and in ignorance of the true line does not work an estoppel.

12 Am. Jur. 2d *Boundaries* §89 (1966). Findlay makes no allegations that Moon, silently or otherwise, permitted it to make the improvements knowing the true boundary line. In fact, Moon began to question the location of the boundary at the same time Findlay began to consider making the improvements to the property necessary for the construction of the Marriott Hotel.

In order for acquiescence to work an estoppel in a municipal boundary dispute, there must be more than substantial improvements to the property affected by the dispute. The improvements must have been reasonably induced by the long acquiescence. In the instant case, Moon was clearly not acquiescing in the boundary when the improvements were made. Findlay could not reasonably have been induced by Moon's prior acquiescence to make the improvements to the property when it made them. Estoppel is not applicable here.

Accordingly, we affirm.

### Order

AND NOW, January 27, 1989, the order of the Court of Common Pleas of Allegheny County in the above-captioned case is affirmed.